ERWIN *v.* KERRIN.

Opinion delivered July 6, 1925.

1. LOST INSTRUMENTS—BURDEN OF PROOF.—One who claims title under an instrument alleged to have been lost has the burden of establishing the execution, contents and loss of such instrument by the clearest, most conclusive and satisfactory proof.

2. LOST INSTRUMENTS—SUFFICIENCY OF PROOF.—Evidence *held* to be insufficient to establish the loss of a deed.

Appeal from Prairie Chancery Court, Northern District; *A. L. Hutchins,* Chancellor on exchange; reversed.

*W. A. Leach,* for appellant.

*J. N. Rachels,* for appellee.

WOOD, J.  Jesse Martin died in the year 1872.  At the time of his death he owned a large body of land in Prairie County, Arkansas, including therein a tract consisting of two hundred and forty acres.  He left a widow Narcissa Martin, and four children, Joseph Martin, Lizzie Martin Langford, Artimissa Babb (nee Martin, now McDaniel), and Ab Martin, as his only heirs at law. Joseph Martin died in 1905 or 1906, leaving surviving his widow, now Annie Kerrin, and one daughter, Viola May Martin.  Viola May Martin died April 9, 1915, leaving her surviving, Lizzie Langford, Ab Martin and Artimissa McDaniel as her sole and only heirs at law. The two hundred and forty acres of land were allotted to Narcissa Martin, the widow of Jesse Martin, as her dower interest in his lands.  The reversionary interest in these lands was sold at administrator's sale to pay the debts of Jesse Martin.  Narcissa Martin, the widow of Jesse Martin, died in 1906.  Soon thereafter suit was instituted by those who had purchased at the administrator's sale to quiet the title.  Lizzie Langford, Ab Martin, Viola May Martin and Artimissa Babb (now McDaniel) intervened, claiming the land as the heirs of Jesse Martin, and Annie Martin (now Annie Kerrin, the appellee) intervened claiming dower as the widow of Joseph Martin.  A decree was rendered in that action vesting title to the lands in Lizzie Langford, Viola May Martin, Ab Martin and Artimissa Babb (now McDaniel).

Artimissa McDaniel and Ab Martin conveyed by quitclaim deed to W. A. Leach; Leach and wife conveyed by warranty deed to A. L. Erwin; Artimissa McDaniel also conveyed by quitclaim deed to A. L. Erwin; C. C. McDaniel, administrator of the estate of Ab Martin, also executed an administrator's deed to the estate of Ab Martin; Lizzie Langford (nee Martin) executed a quitclaim deed to W. A. Leach on the 7th of July, 1917, and on the 21st day of July, 1917 Leach and wife conveyed

this interest to A. L. Erwin. By these conveyances Erwin became the owner of all the lands mentioned except the dower interest of Annie Kerrin (nee Martin).

On the 5th of May, 1922, the appellee instituted this action. She alleged in her complaint that she was the widow of Joseph Martin, one of the heirs of Jesse Martin, deceased; that Joseph Martin, at the time of his death, was the owner of an undivided one-third interest in the lands and that he left surviving him his widow, Annie Martin (now Annie Kerrin), and one child, Viola May Martin; that Viola May Martin died without issue, and that upon her death the appellee became seized and possessed of the one-third interest as the sole and only heir of Viola May Martin. In November, 1922, the appellee filed an amendment to her complaint in which she alleged that Joseph Martin had executed to the appellee a deed conveying to her all of his interest in the lands mentioned, and alleging that by virtue of such deed she was an owner of an undivided one-fourth interest in the lands. She further alleged that the deed from Joseph Martin to her had been lost or destroyed and could not be produced; that Erwin was in possession of her interest in the lands, and that the lands were estimated to be of the value of $10,000; that Erwin had been in possession thereof for more than ten years receiving rents and profits, and that he refused to deliver possession or to allow a sale of the lands for partition. She prayed that the lands be partitioned.

She was joined in her amended complaint by Homer L. Martin and Thomas W. Martin, minors, through their next friend and mother, Siretha Martin Harrison, claiming that they were the sole heirs of A. Martin, and entitled as such to an undivided one-fourth interest in the lands. They prayed that they recover of the appellant their interest and for all proper and general relief. The answer of Erwin denied the material allegations of the complaint as to the alleged title of the plaintiffs

and set up that he was the owner of the lands under the chain of title above set forth.

The court, at the hearing, entered a decree dismissing the complaint of Siretha Martin Harrison as the next friend of Homer and Thomas Martin, minors, without prejudice to their interests. The court also entered a decree adjudging that Annie Kerrin is the owner of an undivided one-fourth interest in the lands described in the complaint and decreed as SW¼ section 29 and north half of NW¼ of section 32, township five north, range four west, containing 240 acres, more or less. The court further appointed a master to state an account of the rentals and proceeds from the land, and ordered that the land be sold and the proceeds partitioned between A. L. Erwin and Annie Kerrin, and retained control of the cause until further order of the court. There is no appeal from the decree of the court dismissing the complaint without prejudice to Homer and Thomas Martin, through their mother and next friend, Siretha Martin Harrison, and that branch of the case passes out. A. L. Erwin duly prosecutes this appeal.

While the pleadings and the testimony are voluminous, there are really only two questions presented by this appeal. First, has Mrs. Annie Kerrin (hereafter called appellee) established her title to an undivided one-fourth interest in the lands in controversy through a deed alleged to have been executed and delivered to her by her husband, Joseph Martin; and, second, was Erwin (hereafter called appellant) an innocent purchaser for value?

1. The appellee testified in substance that Joseph Martin was her first husband. He deeded to her an undivided one-fourth interest to the lands described in the complaint. Dr. Burney wrote the deed, and her husband brought it home and gave it to her. The last time she saw the deed was when she gave it to J. N. Rachels, her attorney. She didn't know where the deed was until she went to hunt up some deed of her father's

estate in Mississippi and found this deed in his book over at appellee's brother's house in her father's trunk. She was handed a book and stated that that was the book referred to. After she found the deed her brother, Lige Babb, and nephew, Connie Babb, saw it and heard it read. Appellee was claiming such rights as she had under that deed. She employed Mr. Leach, and when she told him that she was only claiming a dower interest she meant such rights as she acquired under the deed from her husband. She told Mr. Leach such facts as she knew, and he had looked after her interest for nearly ten years. Soon after the Supreme Court decided the case conferring the title of the Jesse Martin heirs, Leach reported to the other heirs that witness had died. Since the death of Joseph Martin, her husband, neither Ab Martin nor Mrs. McDaniel had claimed any interest in that part of Jesse Martin's estate which belonged to her husband, Joe Martin, and which he deeded to the appellee.

Mrs. Siretha Martin Harrison testified that she had seen a deed from Joseph Martin conveying his interest in the Jesse Martin estate to his wife, Annie Martin. Witness understood that she had a deed to Joe Martin's part of the estate.

Mrs. McDaniel testified that Jesse Martin was her father. She had two brothers, Ab and Joe, and one sister, Lizzie, who, with witness, were his sole heirs. In 1905 a suit was brought by Mr. Leach to recover the interest of the heirs in their father's estate. Neither the witness, nor Ab Martin, nor Lizzie Langford claimed any interest in Joe Martin's land. Appellee was his wife, and she had a child by him. They were both dead, and witness thought appellee was entitled to Joe's interest in the land. Appellee didn't receive any pay for such interest, and witness didn't think Ab had received any. Witness had received pay for her interest, but not for Joe's part. Witness asked Mr. Leach why appellee didn't get her part—Joe Martin's part—

and Leach replied that if there was anything coming to her he would pay it. That was at the time the deed was executed and before, too. After the death of Jesse Martin, his heirs turned the matter over to Mr. Leach to get their interest. While he had it in control and about the time witness executed a deed to her interest and received $500 for same, witness heard that Leach said that appellee was dead, but witness knew that she was not dead.

Connie Babb testified that appellee was witness' aunt. She was present one day when appellee was looking through her trunk, and came across an old book like one shown witness. She found in that book a deed from Joe Martin to appellee deeding his interest in the lands across the river to her. Mr. Rachels was present. Witness heard appellee read the deed, and after she read it she handed it to Mr. Rachels.

Lige Babb testified that he was a brother of the appellee, and remembered the time when she was down at his house looking through a trunk for some papers of her father's estate. Witness was shown in a little book, and stated that he had seen the same many times. The appellee found in that book on the occasion named some papers that belonged to witness' father, and also some that belonged to witness' sister. Among these papers was a deed made by Joe Martin to appellee. After the deed was found, it was handed to Mr. Rachels, and he took it away. That was the first time witness had ever seen the deed.

J. N. Rachels testified that he was employed at first by other persons than the appellee to investigate the title to the Martin lands, and found that 240 acres had gone through the courts. There were four Martin heirs, Joe Martin, Ab Martin, Lizzie Langford and Artimissa McDaniel. Ab and Joe had deeded their interest to their wives. The women brought suit through Mr. Leach for recovery of the land. Witness came to Des Arc and made some investigations. He was looking through

appellee's father's papers and also her husband's papers and found the deed from Joseph Martin to the appellee. He compared the numbers in that deed with the lands in the original complaint and found they were the same. He then filed the amendment to the complaint claiming title to the lands in appellee through this deed. Witness decided to have the deed recorded. He placed the deed with a check in a letter to appellee containing instructions to the clerk of Prairie County as to how to proceed, and what disposition to make of the deed after recording it. He mailed the letter to appellee. Appellee informed witness that the letter never reached her. The consideration mentioned in the deed was $1.00 and love and affection. On cross-examination witness stated that he had a conversation with appellee before he filed the first complaint. He knew at that time that she was claiming to have a deed to the land. Witness was asked: "Why is it then that you brought suit for her as the heir of her daughter if you knew at that time she had the deed?" Witness answered: "I did that for this reason: I told you a moment ago, and I repeat it, that lost deeds are seldom found. Mrs. Kerrin, if she will pardon me for it, I found to be about one of the most ignorant women about land titles that God Almighty ever allowed to live in Arkansas, and the most of the information that I could get about the title I got from outsiders, and for that reason I alleged, basing my allegations as much upon my presumption of the law as otherwise, that she inherited it because I had understood that the heirs had agreed upon the interest that each should have." Ques. "You drew that complaint, Mr. Rachels, didn't you, on your understanding of the law at that time, that she would inherit from her daughter, didn't you?" Ans: "I drew that complaint at that time for a double purpose; first, because I believe, as I have been told, that those heirs had agreed on a division, and furthermore because I believed that under the peculiar circumstances of the estate and on

account of the agreement the court would so hold." Ques: "You didn't change your complaint until after you received a letter from me calling your attention to the decision of the Supreme Court in the case of *Kelly's Heirs* v. *McGuire,* did you?" Ans. "I didn't change my complaint until after I received that and many other letters from you, but I knew of that case before you wrote me, and I wouldn't have changed my complaint if I hadn't had the deed in my hand at the time and was reasonably certain that I would be able to preserve it and present it in court."

Leach testified that he represented the Martin heirs in litigation involving the title to the lands described in the complaint. He then testified to the various deeds executed to him by the Martin heirs, and the deed executed by him to Erwin, as already mentioned. He further stated that at the time his contract with the Martin heirs was signed to represent them in the litigation, it was his understanding that Viola May Martin, Ab Martin, Artimissa Martin, and Lizzie Martin, were the only heirs of Jesse Martin, each having a one-fourth interest in the estate. The only claim that the appellee had ever made to these lands was a dower interest as the widow of Joseph Martin. The deeds were made on the theory that whatever interest Viola May Martin had in the lands were cast by the law of descent upon Ab Martin, Artimissa McDaniel and Lizzie Langford, and the deeds were executed for the purpose of conveying to Erwin all the title except such interest as the appellee might have in the lands as the widow of Joseph Martin. The deeds mentioned were identified and introduced in evidence. Witness then entered upon an extended and detailed explanation of his employment and connection with the litigation involving title to the lands in controversy and the result of that litigation, which it is unnecessary, in view of the conclusion we have reached, to set forth at length, and it would unduly extend this opinion to do so. Witness stated that when the lands

were sold the question of appellee's interest was discussed, and it was the understanding of all parties that the only interest she had was a dower interest, which was to be later adjusted. He further stated that, during the seventeen years of the litigation involving the title to the lands in controversy, he had never been informed by the appellee that she had a deed from her husband to his undivided interest in the lands. Witness stated that he wrote a letter to appellee on August 5, 1916, which the appellee had introduced in evidence. This letter contained among others the following statement: "I am willing to buy out your interest if we can agree on the price, but don't care to buy until the case is decided." This letter was written in response to a letter received by witness from the appellee with reference to the land matter—the litigation then pending in the Supreme Court—in which she sought to sell her dower interest in the lands. Witness was informed by the appellee that her interest was a dower interest, and that is the interest witness suggested he might buy when the Supreme Court passed on the case. The letter was written with that understanding. We have thus set out fully the testimony upon which the appellee relies to establish her title to the lands in controversy through the alleged lost deed of her husband.

The rule is well established in this State, as well as by the authorities generally, that the burden is upon one who claims title under the alleged lost instrument to establish the execution, contents, and loss of such instrument by the clearest, most conclusive, and satisfactory proof. *Nunn* v. *Lynch,* 73 Ark· 20; *Kennedy* v. *Gilkey,* 81 Ark. 147; *Jacks* v. *Wooten,* 52 Ark. 515. See also 25 Cyc. 1626, and numerous cases cited in note; 17 Cyc. 778, and numerous cases cited in note. Note to *Clark* v. *Turner,* 38 L· R. A. at page 441; *Johnson* v. *Kennedy,* 53 S. W. 221; *Rhodes* v. *Vinson,* 52 Am. Dec. 685.

We deem it unnecessary, and it could serve no useful purpose, to argue the testimony above set forth. It speaks for itself, and suffice it to say, we are convinced that it does not meet the requirements of the law above announced for the establishment of such instruments. Neither the proof of the execution, nor the loss is sufficient to comply with legal standards for the establishment of title to lands by parol testimony as against one who holds the record title. It would be dangerous in the extreme for titles to land to be suspended upon such slender threads. Such is not the policy of the law in any jurisdiction. Hence the rule as above stated.

2. Our conclusion on the first proposition makes it unnecessary to discuss the second. The decree is therefore reversed, and the cause is remanded with directions to dismiss the complaint for want of equity. It is so ordered.