DILLARD v. HARDEN.

4-5334                                    124 S. W. 2d 10

Opinion delivered January 23, 1939.

*H. L. Veazey,* for appellant.

*C. T. Sims,* for appellee.

SMITH, J. In a suit filed April 23, 1937, appellant, Dillard, prayed the restoration of an alleged lost deed, and from a decree denying that relief is this appeal. In an excellent opinion prepared by the chancellor denying that relief the court correctly declared the law to be that "To establish a lost deed, evidence of the execution must be clear, concise and satisfactory." The chancellor, being of the opinion that the testimony did not measure up to that high standard, denied the relief prayed

Now, while it is true, as said by the court below, that the testimony must be "clear, concise and satisfactory," it is not required that it be undisputed. It is sufficient if the testimony which we credit and accept as true shows clearly, concisely and satisfactorily that the deed sought to be restored had in fact been executed and delivered. We have many cases on the subject, which we shall not review and distinguish the conditions under which this relief was granted in some cases and denied in others.

There are conflicts in the testimony which cannot be reconciled, but, upon a consideration of this testimony in its entirety we think the following facts clearly appear and are shown to be true to our entire satisfaction.

Over a period of several years, Dillard loaned appellee, Harden, large sums of money, to secure the payment of which annual mortgages were given on several separate tracts of land the title to which was in Harden. R. D. Jones, a young inexperienced married man nineteen years old, desired to buy one of the farms owned by Harden, containing 52 acres, known as the Parsonage Place, and he applied to Dillard to assist him in its purchase. An arrangement was made whereby Harden conveyed the Parsonage Place to Jones. The deed was not

delivered to Jones by Harden, but was delivered to Dillard for Jones, who had paid Dillard $100 when the arrangement was made and the additional sum of $100.00 when the deed from Harden was delivered to Jones by Dillard.

Whether the transaction occurred in this manner is the question in the case. That it did so occur appears to us to be very conclusively shown. The undisputed testimony is to the effect that the circuit clerk produced from the court files in his office a note which had been an exhibit filed in a foreclosure proceeding brought by Dillard in January, 1929, to foreclose the last mortgage given him by Harden. Indorsed on this note were a number of credits, one under date of January 21, 1927, as follows: "Credit 52 acres of land to R. D. Jones, $1,000." Upon this fact and the effect thereof the chancellor commented in his opinion as follows: "This land, with other, was mortgaged to plaintiff by Harden for a considerable sum of money. Upon transfer of title, as is contended by plaintiff, Harden was credited with $1,000, the purchase price of the land. This credit would not have been made unless plaintiff had not felt sure that Harden had, in fact, sold the land to Jones. No substantial advantage moved to plaintiff in substituting one debtor for another where the debt was secured by the same collateral. Plaintiff would not have done this if he had not honestly believed that Harden and his wife had not conveyed a good and sufficient title to R. D. Jones."

There appears to us to be no escape from the effect of this action. Dillard had a mortgage on all of Harden's land to secure his entire debt. He did not foreclose the mortgage as to the Parsonage Place; on the contrary, he credited the note on which the foreclosure suit was based with a thousand dollars, which was the price Jones agreed to pay for this 52 acre tract. Of course, Dillard did not convey to Jones, for he did not have the title, only Harden could convey. Dillard testified that when this credit was given, Harden delivered to him a deed, signed by Harden and wife, and properly acknowledged, to Jones, which deed he delivered to Jones when the second payment of

one hundred dollars was made, leaving a balance of $800 due by Jones as purchase money.

Another fact of convincing significance is that when the deed from Harden to Jones was delivered, thereby vesting title in Jones, a mortgage on this tract of land was given by Jones to Dillard, and the land there mortgaged was described as being the same land which Harden had that day conveyed to Jones. This mortgage was placed of record a few days after its execution.

Thereafter, Jones entered into possession of the land, and remained there during the major portion of that year, when his wife died, and he conveyed his interest to R. L. Hill. That deed was never placed of record. Hill testified that his purchase from Jones was evidenced by the indorsement and transfer to him by Jones of the deed to Jones, and he was under the impression that his deed had been made by Dillard, and not by Harden. It must be remembered that the transaction was eleven years old when the witnesses testified concerning it, and the infirmity of memory accounts, in part, for the contradictions appearing in it. Jones' testimony is very positive to the effect that he burned the deed given to him by Harden, and he was equally positive that the deed received by him was signed by Harden and his wife.

We do not regard the manner of conveyance from Jones to Hill as of controlling importance. Both testified that Jones sold the land to Hill, and that Hill entered into the possession of the land under this purchase, and remained in possession of the land for one year and paid the taxes on it for two years. Neither Jones nor Hill now claims any interest in the land. They both concede the sale and conveyance by them of their respective interests. But we regard the testimony of Jones as second in importance only to that of Dillard. That Jones was a disinterested and truthful witness is expressly conceded by appellee, and Jones' testimony is very definite to the effect that when he purchased the land he received from Dillard a deed signed by Harden and Harden's wife. The mortgage given by Jones to Dillard and immediately placed of record before any question had arisen, recites the facts to be, as Dillard testified they were, that Jones

was giving the mortgage on lands which he had that day bought from Harden, and, as has been said, the controlling question in the case is whether Harden had conveyed the land to Jones.

The testimony is undisputed to the effect that Hill bought the land from Jones or or about January 1, 1928, and paid Jones $200 in cash, which was the amount Jones had paid Dillard. On January 11, 1928, Hill and wife executed to Dillard a mortgage on the same land for a consideration of $864. Hill did not record his deed from Jones, but Dillard did record his mortgage from Hill.

The only reasonable explanation of these transactions is the one offered by Dillard—that he permitted his mortgagors to sell their interests in the Parsonage Place, but in each instance he required their vendees to renew the security first given him by Harden against that land.

On October 10, 1929, Hill and wife conveyed the land to M. K. Roberts, and on the same day Roberts and wife executed to Dillard a mortgage to secure the sum of $774.48, thus continuing the policy of permitting the mortgagors to convey the land and of requiring their vendees to preserve Dillard's lien on the land for the balance due on the credit which Dillard had given Harden.

On January 21, 1932, Roberts and wife conveyed the land to Dillard by warranty deed for the recited consideration of $974.34, which deed was duly recorded. In the fall of 1936 Harden gave E. D. Wright a lease on the land, and Wright took possession thereof. Dillard negotiated a sale of the land and caused an abstract of the title thereto to be prepared, an examination of which disclosed that the deeds from Harden to Jones and from Jones to Hill were not of record. Dillard then attempted to procure a quitclaim deed from Harden and, failing to do so, brought this suit to have those deeds restored as muniments of title and to have his title quieted and confirmed.

Harden and his wife denied that they had ever executed a deed to Jones. They testified that they had reserved this Parsonage Place as their homestead, and not only denied selling the land, but denied also that they had mortgaged it. They testified that Dillard took the

acknowledgments to the mortgages to himself, and they denied acknowledging the mortgage or that they appeared before the officer whose certificate of acknowledgement appears on the mortgage.

We do not recite the testimony relating to the acknowledgements of the various mortgages from Harden and his wife to Dillard. The Honorable Patrick Henry, later and at the time of his death the Judge of that circuit, executed the certificates of acknowledgement to three of these mortgages as a Notary Public. We entertain no doubt whatever that Harden and his wife executed and acknowledged the mortgages. However, the proper time to have raised and litigated that question was in the fore-closure proceeding in the Chancery Court when the fore-closure decree was rendered pursuant to which the lands were sold except the Parsonage Place for which the cred-it of a thousand dollars had been given as hereinbefore recited and which, for that reason, was not included in the foreclosure decree and sale. It does not appear that any question was then made that the mortgage had not been duly acknowledged.

Harden's testimony and that of his wife to the effect that they did not execute a deed to Jones, when con-sidered apart from the opposing testimony carries but little weight when considered in connection with Harden's subsequent conduct. That he owned the Parsonage Place at the time of the foreclosure decree is a fact which no one disputes, and that it was not included in the fore-closure decree is equally certain. Yet, without objection, he permitted Jones to take possession as owner. Hill succeeded Jones in possession, and Hill was succeeded by Roberts, who conveyed the land by warranty deed to Dillard. These parties occupied the land for ten years, during all of which time Harden made no demand for possession, or any demand for rent, nor did he subse-quently pay the taxes. Harden lived in the community for two years after Jones took possession. He then re-moved to an adjoining county where he lived for five years when he returned to the vicinity of the land where he resided for two years when he was requested and re-fused to execute a quitclaim deed. It was this request for

a quit claim deed which furnished Harden with the information that there was no deed of record from him to Jones, and, in our opinion, inspired his denial that he had executed such a deed.

The court below evidently attached much importance to the statement of Dillard that he—Dillard—knew nothing about a sale by Harden to Jones until Jones approached him with a proposition to buy the land, and the failure of the testimony to show the circumstances of the execution of the deed by Harden and wife. But the testimony does show that, while the title was in Harden, Dillard had a mortgage on all the lands for its value; indeed, the thousand dollar credit and the proceeds of the foreclosure sale did not suffice to pay the mortgage debt. We regard it as unimportant who negotiated the sale to Jones from Harden. The controlling and undisputed fact is that Dillard gave credit for a thousand dollars on the note upon which his foreclosure proceeding was based. It is true also that the circumstances of the execution of the deed from Harden to Jones were not shown, but Dillard testified that Harden delivered to him a deed from Harden and wife to Jones, properly executed and acknowledged. Dillard did not remember definitely the name of the acknowledging officer, but stated his recollection, and Jones testified positively that Dillard gave him a deed to which the names of Harden and wife were signed.

The opinion of the court recites that Jones knew, "as did most of his neighbors that Dillard had been the financial backer of the Hardens for some time and as such held mortgages on the real property owned by Harden." Jones was an inexperienced buyer and evidently trusted Dillard to consummate the deal he—Jones—had made with Harden, and the delivery of the deed from Harden to Dillard for delivery to Jones was, in legal effect, a delivery to Jones.

There are certain apparent contradictions between the testimony of Dillard and Jones as to the circumstances attending the delivery of the deed by Dillard to Jones, but that may be accounted for by a consideration of the length of time which had elapsed since that event oc-

curred. The controlling question is whether Harden executed a deed to Jones, and the testimony, above recited, convinces us that he did.

Harden attempted to explain his inaction during all the years the land was being adversely held by saying that he consulted an attorney, who "Advised me to keep quiet and see what would take place, and I acted under his instructions." It does not appear when this advise was given, nor was the attorney called to corroborate Harden, but Harden admits that he left the county where the land is located, and removed, in 1929, to an adjoining county where he resided for five years, and then returned to the neighborhood from which he had removed in the Fall of 1936 and placed a tenant in possession of the land, an action he could have taken years before if he, in fact, had not sold the land and was during all these years the owner thereof.

In the case of *Jacks* v. *Wooten*, 152 Ark. 515, 238 S. W. 784, suit was brought to establish a title based upon an alleged lost deed which had never been recorded. In granting the relief prayed the court there said: "In determining whether a deed claimed to have been lost was executed the court might consider how long the parties asserting the claim had been in possession of the land, its value, whether the land had been held adversely to such claim, and all the surrounding circumstances. *Carpenter* v. *Jones*, 76 Ark. 163, 88 S. W. 871."

So, here, the long continued adverse possession of the land since the time when Dillard and Jones testified a deed from Harden was delivered strongly confirms the conclusion that such a deed was made and delivered.

In the case of *Hospital & Benevolent Ass'n.* v. *Arkansas Baptist State Convention*, 176 Ark. 946, 4 S. W. 2d 933, relief similar to that here prayed was granted, although the testimony was as sharply conflicting as in the instant case. There the secretary of the association, who signed the deed as secretary for the association, denied having signed the deed alleged to have been lost without having been recorded, but we announced our conclusion to be that the good lady—the secretary—had merely forgotten the incident, and we found the fact to

be that she had signed the deed notwithstanding her denial that she had done so.

We have the same certainty in the instant case that the deed was executed notwithstanding numerous contradictions in the testimony.

The decree of the court below must, therefore, be reversed, and it is so ordered, and the case will be remanded with directions to quiet the title of Dillard against any and all claims of title on the part of Harden and his wife.